# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| FERNANDO GALVAN LOPEZ, MARGARITA RAMIREZ ARELLANO, Individually and as Parents and Next Friends of AG, JG, IG and AG, and as Assignee of Alec Wolf,<br><br>Plaintiffs,<br><br>vs.<br><br>TRAVELERS INDEMNITY CO. OF AMERICA,<br><br>Defendant. | No. C24-4034-LTS-KEM<br><br>**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

This matter is before me on cross-motions (Docs. 24, 25) for summary judgment. Plaintiffs Fernando Galvan Lopez and Margarita Ramirez Arellano filed their motion (Doc. 24) with an accompanying brief (Doc. 24-1), statement of material facts (Doc. 24-2) and appendix (Doc. 24-3). Travelers Indemnity Co. of America (Travelers) filed a resistance (Doc. 27) with a response to plaintiff's statement of material facts (Doc. 27-2), its statement of additional material facts (Doc. 27-1) and an appendix with a table of contents (Docs. 27-3, -4). Plaintiffs then filed a reply (Doc. 29), a response to Travelers statement of additional facts (Doc. 29-1) and a supplemental appendix (Doc. 29-2).

Travelers similarly filed a motion (Doc. 25) for summary judgment with a brief (Doc. 25-1), statement of material facts (Doc. 25-2) and an appendix plus a table of contents (Docs. 25-3, -4). Plaintiffs filed a resistance (Doc. 26) and attached a response to Travelers statement of facts (Doc. 26-1), its statement of additional material facts (Doc. 26-2) and an appendix (Doc. 26-3). Travelers then replied (Doc. 28), also responding to

plaintiff's statement of additional material facts (Doc. 28-1) and filed a supplemental appendix with a table of contents (Docs. 28-2, -3). Oral argument is not necessary. LR 7(c).

## II. UNDISPUTED FACTS[1]

Except as otherwise noted, the following facts are undisputed for purposes of the parties' motions. Galvan Lopez was seriously injured following a three-car accident. *See generally* Doc. 5. He had been driving in foggy conditions when a semi-trailer pulled in front of him which he hit. Alec Wolf, a gofer for Nelson Engineering, then rear-ended Galvan Lopez. *Id.* at 3. When the crash occurred, Wolf had been driving to the Nelson Engineering shop intending to load building materials to take to a distant jobsite. Doc. 24-2 at ¶¶ 14, 18; Doc. 27-1 at ¶ 24. He was driving his father's personal vehicle (at his father's direction), his father being a project manager for Nelson Engineering. Doc. 24-2 at ¶¶14, 21; Doc. 25-2 at ¶ 35; Doc. 26-3 at 12.[2] Because of the crash, Wolf never made it to the shop. Doc. 25-2 at ¶¶ 36–37.

Wolf's father testified that Nelson Engineering had two or three other project managers at the time. Doc. 24-3 at 142. As a project manager, he was responsible for scheduling and directing lower-level employees, like Wolf. *Id.* But he clarified that the project he sent Wolf to complete was not his own but was, instead, that of another project manager who communicated the need for Wolf through him. *Id.* at 144; Doc. 25-2 at

---

[1] The local rules require that a party denying a statement of material fact cite to specific parts of the record "that support the resisting party's refusal to admit the statement." LR 56(b). Failing to do so "may constitute an admission of that fact." *Id.* Here, however, there are many examples in which a party stated a blanket denial of a material fact or failed to provide specific context to a denial. Those facts at issue are deemed admitted.

[2] There is a genuine disagreement as to the relational capacity between Wolf and his father when Wolf borrowed the car. *Compare* Doc. 24-2 at ¶ 32 (Galvan Lopez arguing the loan was done in a work-related capacity), *with* Doc. 25-2 at ¶ 42 (Travelers arguing the loan was in a personal or familial capacity). This recitation of facts is not meant to speak to the propriety of either side's contention, just that the parties agree that Wolf's father loaned Wolf his personal vehicle.

2

¶ 34. Wolf's father also described how Wolf would drive Nelson Engineering vehicles on an as-needed basis, including how Wolf was allowed to take a vehicle home overnight sometimes (Doc. 24-3 at 142), that he had directed Wolf to drive to the shop that morning (*id.* at 143) and that he loaned his car to Wolf intending for it to be used for the delivery (*id.* at 142–44). He further explained his reasoning for having Wolf use his personal vehicle instead a vehicle from Nelson Engineering's fleet: the work trucks were older and less reliable, so the loan was "a father's thing." *Id.* at 142–43.

The purported project manager for the job states by affidavit that he would have been Wolf's immediate supervisor on the day of the crash, he had not given Wolf permission to use a Nelson Engineering vehicle on Wolf's trip to the shop and, because Wolf never made it to the shop, there was no telling whether Wolf would have used his father's vehicle to make the delivery as Wolf's father intended. Doc. 25-4 at 57–59. The Vice President of Nelson Engineering submitted an affidavit supporting the project manager's averments while also stating that Wolf's father did not have the authority to loan out his personal vehicle for work purposes on Nelson Engineering's behalf. *Id.* at 60–63.

Travelers insured Nelson Engineering through a commercial automobile insurance policy, excess follow-form and umbrella policy at the time of the crash. *Id.* at ¶ 1. The commercial automobile policy included the following coverage provisions:

### BUSINESS AUTO COVERAGE FORM

> Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.
>
> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

**SECTION II – COVERED AUTOS LIABILITY COVERAGE**

**A. Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto". . . .

**1. Who Is An Insured**

The following are "insureds":

a. You [Nelson Engineering] for any covered "auto".

b. Anyone else while using with your permission a covered "auto" you [Nelson Engineering] own, hire or borrow . . .

*Id.* at ¶ 17.[3] The definition of "insured" was expanded in an endorsement to also include any "'employee' of yours . . . while using a covered 'auto' you don't own, hire or borrow in your business or your personal affairs. *Id.* at 51. An "auto" included "a[ny] land motor vehicle . . . designed for travel on public roads." Doc. 24-3 at 31; *see also id.* at 13, 22 (covering automobile liability for "[a]ny '[a]uto'"). The excess follow-form incorporated the same terms as the commercial auto policy. Doc. 24-3 at 79; Doc. 25-2 at ¶ 19. The umbrella policy excluded coverage for the use of any auto. Doc. 24-3 at 88; Doc. 25-2 at ¶ 21.

### III.   PROCEDURAL HISTORY

Galvan Lopez sued the driver of the semi-trail and Wolf in state court for damages resulting from the accident. Doc. 25-2 at ¶¶ 5–6. Though the Travelers policy was potentially implicated in the lawsuit, Travelers allowed two other insurance companies to

---

[3] This subsection continues with some exceptions, but "Travelers has never taken the position that [the] exceptions apply." Doc. 27 at 5.

defend Wolf while agreeing to monitor the case and reserving its rights as to whether Wolf was covered under its policy. *Id.* at ¶ 14. Ultimately, Wolf settled before trial, confessing judgment in the amount of $4 million and assigning his right to coverage under the Travelers policy to Galvan Lopez. Doc. 24-3 at 177–84. Travelers then issued a coverage denial letter asserting that Wolf was not covered under its policies. *Id.* at 69–71. In response, Galvan Lopez filed a state court petition for declaratory judgment, seeking a determination as to the scope of Travelers' insurance coverage and requesting recovery of the $4 million to which Wolf confessed judgment. Doc. 5. Travelers removed the action to this court based on diversity jurisdiction. Doc. 1.

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475

5

U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact means "sufficient evidence support[s] the claimed factual dispute" to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and, through depositions, affidavits or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). If a party fails to establish the existence of an essential element of a claim or defense when they would bear that burden of proof at trial, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining whether there is a genuine issue of material fact, I view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. I must further give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996). On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A *Wright & Miller's Federal Practice and Procedure* § 2720, Westlaw (database updated Sept. 2025).

# V. ANALYSIS

In this diversity jurisdiction case, the court must apply Iowa substantive law but federal procedural rules. *KOKO Dev., LLC v. Phillips & Jordan, Inc.*, 101 F.4th 544, 547 (8th Cir. 2024) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In applying the substantive law of Iowa, I must follow the decisions of the Iowa Supreme Court and where it has not addressed an issue, I must predict how it would decide. *Olmsted Med. Ctr. v. Cont'l Cas. Co.*, 65 F.4th 1005, 1008 (8th Cir. 2023). When making such predictions, I "may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data." *Id.* (ellipses in original).

The parties' summary judgment motions focus primarily on whether Wolf was an "insured" under the Travelers policies. To answer that question, I start with the terms of the contract itself. *Osmic v. Nationwide Agribus. Ins.*, 841 N.W.2d 853, 858 (Iowa 2014). Each term must be interpreted in the context of the policy as a whole; no words should be strained to impose or deprive coverage. *Nat'l Sur. Corp. v. Westlake Inv., LLC*, 880 N.W.2d 724, 733–34, 740 (Iowa 2016). Iowa law places the burden on Galvan Lopez to prove that he, standing in the shoes of Wolf, is covered under the insurance policies. *Dostart v. Columbia Ins. Grp.*, 20 N.W.3d 225, 229 (Iowa 2025). If a material portion of a policy is ambiguous however, I must construe those terms in his favor. *Nat'l Sur. Corp.*, 880 N.W.2d at 734.

## A. The Policy

The main dispute is over subsection b of the policy, covering "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow." The two key terms in the provision are "borrow" and "permission."

Iowa law gives the term "borrow" a nontechnical meaning when it is not defined in a policy. Thus, "a vehicle is borrowed when someone other than the owner temporarily gains its use." *Andresen v. Emps. Mut. Cas. Co.*, 461 N.W.2d 181, 185 (Iowa 1990). In turn, a vehicle can be "used" in a narrow sense (such as when one

7

retains an element of control over the vehicle) or a broad sense (such as when the vehicle is used as a component of an activity). *IMT Ins. v. Amundsen*, 376 N.W.2d 105, 107–08 (Iowa 1985). In *IMT*, the Iowa Supreme Court accepted the narrow reading because it was a reasonable interpretation advanced by the insured. *Id*. But the Court would have been equally willing to accept the broad interpretation, had that been the insured's preferred definition. *Id*. Taking the insured-friendly reading here then, Nelson Engineering can be understood as having temporarily gained the vehicle's use (and thus, borrowed it) when the vehicle was being used as a component of its business. Driving to and from work qualifies. *See Jones v. Blair*, 387 N.W.2d 349, 355 (Iowa 1986) (characterizing the drive to and from work as "work-motivated").

Permission, then, is central to whether the borrowing of the vehicle can be attributed to Nelson Engineering. There is no dispute that Wolf had his father's permission to drive the vehicle to work. *See* Doc. 25-2 at ¶ 35. However, whether Nelson Engineering also gave permission for Wolf to use the vehicle on the company's behalf turns on agency principles. That is because Nelson Engineering, as a corporate entity, can only act through its officers or employees. *Gabelmann v. NFO, Inc.*, 571 N.W.2d 476, 480 (Iowa 1997). And for officers or employees to act on the company's behalf, they must have that authority delegated to them.

Iowa recognizes two types of authority: actual and apparent. *See Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 776 (Iowa 2010).

> Actual authority to act is created when a principal intentionally confers authority on the agent either by writing or through other conduct which, reasonably interpreted, allows the agent to believe that he has the power to act. Actual authority includes both express and implied authority. Express authority is derived from specific instructions by the principal in setting out duties, while implied authority is actual authority circumstantially proved.

*Id*. (emphasis omitted). By contrast, apparent authority "is authority the principal has knowingly permitted or held the agent out as possessing." *Id*. As apparent authority

8

"focuses on the principal's communications to" third parties, *id.*, and with no third-party here, this dispute centers on Wolf's father's actual authority.

Ultimately, whether Wolf is an insured under the policy provision turns on whether Wolf's father, as a project manager for Nelson Engineering, had the authority to borrow a vehicle on the company's behalf and direct Wolf to drive it. If so, the vehicle would be borrowed by Nelson Engineering with its permission. The scope of an agent's authority is usually a question of fact. *Mayrath Co. v. Helgeson*, 139 N.W.2d 303, 305–06 (Iowa 1966).

### 1. *Was Wolf's Father His Supervisor When the Crash Occurred?*

Travelers first challenges whether Wolf's father had the capacity to direct his son on the day of the accident. Galvan Lopez has assumed throughout this case that Wolf's father was his supervisor on the project Wolf was heading to start. *See* Doc. 5 at ¶ 60 (describing Wolf's father as his project manager). Travelers did not contest this characterization in its discovery responses. *See* Doc. 26-3 at 4 (Traveler's initial disclosures describing Wolf's father as an "employee of Nelson Engineering, Alec Wolf's father and supervisor"); Doc. 26-3 at 12 (Travelers' notes from a discussion with Nelson Engineering's President recording that Wolf's father "is basically his supervisor"). However, when Wolf's father was deposed, he indicated that the project he sent Wolf to begin was not his and that Wolf would have been helping a different Nelson Engineering project manager. Doc. 24-3 at 144. Wolf's father explained that "[e]verybody knew that I had [Wolf] working for me and if I couldn't keep him busy, he stayed home" so "if somebody else could use him," they would talk to Wolf's father about having Wolf deliver for them. *Id.*

Travelers claims that after the deposition, it discovered that the project Wolf set off to begin was being managed by Justin Teunissen. Doc. 28 at 3. At 4:14 p.m. on the last day of discovery, three weeks after the deposition, Travelers supplemented its initial disclosure to include Teunissen as "hav[ing] knowledge of the use of Nelson Engineering

9

vehicles by [Wolf] . . . and other evidence to prove that [Wolf] would not have been driving a Nelson Engineering vehicle on the day of the accident." Doc. 26-3 at 9. A month after the disclosure, Travelers submitted an affidavit in support of Travelers' motion for summary judgment in which Teunissen stated that he was Wolf's immediate supervisor on the crash date, that he was responsible for assigning Wolf work, and that he had not given Wolf permission to use a Nelson Engineering vehicle at that point. Doc. 25-4 at 57–58. These statements were backed by an affidavit from a Vice President of Nelson Engineering. *Id.* at 60–61. Based on these affidavits, Travelers contends that Wolf's father could not have the supervisorial authority over Wolf such that he could direct the means of Wolf's travel.

In response, Galvan Lopez asks the court to either reject the two affidavits as "sham affidavits" or strike Teunissen's affidavit as a discovery sanction for its late disclosure. A so-called "sham affidavit" is an affidavit that contradicts a declarant's prior sworn testimony or is a "sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before." *Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020) (alteration in original). Galvan Lopez contends that the doctrine is applicable here because he had considered Wolf's father's supervisorial capacity settled until the affidavits were filed, the averments being possibly contradicted by discovery evidence. *See, e.g.*, Doc. 26-3 at 15 (Nelson Engineering's vice president representing to Travelers that Wolf's father remained responsible for his son's timesheets even on the day of the crash).

Although Travelers asserting that Wolf's father was not his supervisor is a newer development, its basis is in the father's deposition testimony. Teunissen's and the Vice President's affidavits do not contradict Wolf's father's testimony. If anything, the affidavits provide some context to what was said. Even if the affidavits are contradictory though, there is a question whether the doctrine applies when neither Teunissen nor the Vice President were the witness who was deposed on the subject. *See K.R.S. v. Bedford Cmty. Sch. Dist.*, 109 F. Supp. 3d 1060, 1073 (S.D. Iowa 2015) (sham affidavit doctrine

10

is inapplicable when the affidavit does not contradict prior testimony of the same affiant). I find that the affidavits are not sham affidavits.

Striking Teunissen's affidavit as a discovery sanction is a closer call. Federal Rule of Civil Procedure 26 requires that parties comply with discovery requests and timely supplement their responses when new evidence is discovered. "The disclosure mandates in Rule 26 are given teeth by the threat of sanctions in Rule 37." *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018). One such sanction being that a party who fails to timely supplement information "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Galvan Lopez claims that Teunissen's late involvement prejudices his case, as it opened a new narrative that, because of its tardiness, could not be tested through a deposition or other discovery means. Doc. 26 at 11. Travelers, for its part, argues that it had "promptly supplemented its discovery response[]" after learning Teunissen's role. Doc. 28 at 3. However, I need not resolve this issue, as there is a genuine dispute of fact without factoring in Teunissen's affidavit. Striking it would still leave the Vice President's affidavit, which Galvan Lopez does not challenge as being late. And that affidavit creates a dispute of material fact as to what authority Wolf's father had to direct Wolf. Ultimately, the record contains sufficient evidence to support either party's contention. Whether or not Wolf's father had a supervisory role over his son at the time of the accident is a genuine issue of material fact that cannot be resolved on summary judgment.

### 2. *What Authority Does a Nelson Engineer Project Manager Have?*

Whether Wolf's father was Wolf's supervisor matters only if a project supervisor had the authority to direct an employee to use a borrowed vehicle on Nelson Engineering's behalf. Some evidence suggests that he did. *See* Doc. 26-3 at 12 (company's President being recorded as believing "that [Wolf] should have been driving

11

Case 5:24-cv-04034-LTS-KEM   Document 40   Filed 11/13/25   Page 11 of 15

a Nelson Engineering vehicle on the accident date—his father's vehicle.");[4] *id.* at 25 ("[Wolf] was authorized to drive Nelson vehicles and therefore he could drive his father's vehicle on company business . . . ."); *id.* at 13 ("Wolf normally used a Nelson Engineering . . . pickup truck to pick and deliver materials. Because he was going to be delivering farther away than usual on the date of the accident, he took a more reliable personal vehicle belonging to [his father]."). This is supported by Wolf's father's own understanding of his authority as a project manager. Doc. 24-3 at 142; *see also* Doc. 25-4 at 58 (affidavit from Teunissen suggesting project supervisors had the authority to assign vehicles to workers).

Travelers does not challenge Wolf's father's authority through an employee handbook or other employee policy restricting his authority on the matter. *Cf. State Farm Mut. Auto. Ins. v. Emps. Mut. Cas. Co.*, 500 N.W.2d 80, 82–83 (Iowa Ct. App. 1993). It relies instead on its Vice President's affidavit denying that the company delegated that authority to Wolf's father. Doc. 25-4 at 62. Of course, I cannot resolve credibility issues or weigh the evidence at the summary judgment stage. *Kammueller*, 383 F.3d at 784. Whether Wolf's father had the authority to borrow a vehicle and permit another employee to use it on Nelson Engineering's behalf is a genuine issue of fact that must be resolved at trial.

---

[4] In the last paragraph of Travelers' reply in support of summary judgment, it contends that the statement from Nelson Engineering's President is hearsay that cannot be considered on a motion for summary judgment. Doc. 28 at 5. "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But under the rule, "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Gannon v. Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). Regardless, the record contains sufficient evidence to support Galvan Lopez's position without this statement.

## B. The Extension Endorsement

Travelers' motion for summary judgment also argues that I should not find coverage under the extension endorsement. This endorsement applies to an employee who uses a vehicle in Nelson Engineering's business or personal affairs when the company did not own, hire or borrow the vehicle. Doc. 25-1 at 6–15. For whatever reason, Galvan Lopez disclaimed any need to rely on the extension endorsement. Doc. 24-1 at 7 n.1. He then failed to address any of Travelers' points on why the endorsement should not apply in his resistance to summary judgment and omitted any reference to it in his reply. *See* Docs. 26, 29. "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument." *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009). Thus, Travelers' is entitled to summary judgment on the issue of whether the extension endorsement provides coverage to Wolf. It does not.

## C. Reasonableness of $4 Million Confession of Judgment

Finally, Travelers argues that even if the policy does cover Wolf, there is a genuine dispute of material fact whether the $4 million confession of judgment was reasonable and prudent considering the circumstances of the case. Doc. 27 at 16. Under Iowa law, the injured party has the burden of proving by the preponderance of the evidence that the settlement was reasonable and prudent considering the "facts bearing on the liability and damage aspects of the claim as well as the risks of going to trial." *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 535 (Iowa 1995). The party need not prove the amount of actual liability to meet its burden, only that the settlement amount fits within a damages range that the evidence would support. *Metro. Prop. & Cas. Ins. v. Auto-Owners Mut. Ins.*, 924 N.W.2d 833, 845 (Iowa 2019).

"Though reasonableness is a question of fact, it is an issue of fact to be decided by the court." *Gen. Cas. Ins. Co. of Wis. v. Penn-Co Constr., Inc.*, No. 03-cv-2031, 2005 WL 503927, at *45 (N.D. Iowa Mar. 2, 2005); *see also Metro. Prop. & Cas. Ins.*,

13

924 N.W.2d at 845. That is because it would be self-defeating to mandate a trial on the reasonableness of a settlement when the settlement was meant to avoid a trial. *Gen. Cas. Ins.*, 2005 WL 503927, at *45. However, the reasonableness of a settlement may be submitted to the factfinder when there are lingering questions. *See, e.g.*, *Six v. Am. Fam. Mut. Ins.*, 558 N.W.2d 205, 206 (Iowa 1997) (noting without expressing disagreement that the trial court sent the question to a jury).

Here, Galvan Lopez has not responded to Travelers' concerns over the reasonableness of the settlement amount in any way, such as by submitting affidavits from attorneys with knowledge of settlements and jury verdicts in similar cases. *Cf. McNicholes v. Subotnik*, 12 F.3d 105, 110 & n.6 (8th Cir. 1993). At this point, I find it appropriate to leave for trial the issue of whether Wolf's $4 million confession of judgment was reasonable and prudent.[5]

## VI. CONCLUSION

For the reasons set forth herein:

1. Galvan Lopez's motion (Doc. 24) for summary judgment is **denied**.

2. Travelers' motion (Doc. 25) for summary judgment is **granted in part** and **denied in part**. It is **granted** as to any claim that the Travelers insurance plan covered Wolf through the extension endorsement. It is otherwise **denied**.

---

[5] Travelers does not ask that I find an amount that would be considered reasonable or prudent. Even if I were to find $4 million to be excessive then, that finding would not extinguish Travelers' liability should the policy cover Wolf. *Six*, 558 N.W.2d at 206.

**IT IS SO ORDERED** this 13th day of November, 2025.

_____
Leonard T. Strand
United States District Judge